UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JOSEPH DEROSA,

                           Plaintiff,                      <u>COMPLAINT</u>

        - against -

SAMSUNG ELECTRONICS AMERICA, INC. and    <u>PLAINTIFF DEMANDS A</u>
SAMSUNG ELECTRONICS CO., LTD,               <u>TRIAL BY JURY</u>

                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Joseph DeRosa ("DeRosa" or "Plaintiff") by his attorneys, Vladeck, Raskin & Clark, P.C., complains of Defendants Samsung Electronics America, Inc. and Samsung Electronics Co., LTD (collectively "Samsung," the "Company," or "Defendants") as follows:

<u>NATURE OF CLAIMS</u>

        1.      DeRosa is an established sales leader with decades of experience in telecommunications, including, for nine years, with Samsung. During his time with Samsung, Plaintiff made tremendous contributions to the Company. Among his many accomplishments, DeRosa served as lead architect of a novel deal with Client A that netted Samsung $6.7 billion in revenue. Consistent with his contributions to the Company, DeRosa received positive feedback from his colleagues and managers and consistently received strong performance reviews.

        2.      DeRosa is a Hispanic man. He has the disability of morbid obesity and Defendants regarded him as being disabled.

        3.      Unfortunately, Plaintiff's accomplishments could not shield him from the unlawful bias of his supervisor, Magnus Ojert ("Ojert"). Throughout DeRosa's tenure, Ojert consistently subjected DeRosa to differential treatment because of DeRosa's race, sex, his actual

1

disability, and because Samsung regarded him as disabled. For example, Ojert would subject DeRosa and the other Hispanic man on DeRosa's team to abuse not afforded to their white peers, including yelling "I don't fucking need you []" at them and threatening to fire DeRosa and his Hispanic coworker. Ojert also made comments about Plaintiff's body and weight, including sending him a text message that Plaintiff had a "big ass" and commenting multiple times that Plaintiff should use "chemo" as weight loss technique.

4.    Ojert also repeatedly sexually harassed Plaintiff and others on his team, making inappropriate comments about Plaintiff in front of others at Samsung (including Samsung leadership) to humiliate Plaintiff and minimize his contributions. For example, Ojert has referred to DeRosa, at teamwide meetings as a "failed male prostitute" and suggested on multiple occasions that DeRosa only accomplished what he had because he had been performing "sexual favors" for customers.

5.    Between December 2023 and February 2024, Plaintiff complained repeatedly about Ojert's discriminatory abuse. Ojert's retaliation against DeRosa was swift and harsh. In the months that followed, Ojert, among other things, refused to meet with DeRosa one-on-one, excluded him from meetings to which he should have been a part, imposed unnecessary restrictions on his ability to work from home for medical reasons, and gave him an unjustified negative performance review.

6.    Between February and July 2024, Plaintiff was out of the office on an approved leave. During this time, Samsung purportedly investigated Plaintiff's complaints – a process that took approximately six months. Samsung concluded its investigation in or around May 2024. On information and belief, despite the information Plaintiff shared with Samsung's investigators, Ojert remains employed at Samsung and no significant disciplinary action was taken.

7.    On or about July 26, 2024, approximately two months after Samsung concluded its purported investigation, the Company fired DeRosa. Although the Company claimed that Plaintiff had been fired as part of a restructuring, on information and belief, that explanation was pretextual. There was no legitimate reason to fire someone with DeRosa's stellar track record. On information and belief, Plaintiff has since been replaced by a person with no sales experience or sales accomplishments who is not Hispanic.

8.    Plaintiff brings this action to remedy Defendants' discriminatory and retaliatory treatment.  Specifically, Plaintiff brings this action to remedy violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"); and New York State Human Rights Law, N.Y. Executive Law § 296 et seq. (the "State Law").

## JURISDICTON AND VENUE

9.    This Court has jurisdiction over Plaintiff's Section 1981, Title VII and ADA claims under 28 U.S.C. § 1331, over Plaintiff's Title VII claims under 42 U.S.C. §2000e-5(f)(3) and over Plaintiff's ADA claims under 42 U.S.C. § 12117.

10.    Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over Plaintiff's State Law claims because these claims closely relate to the Section 1981, Title VII and ADA claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants regularly do business in New York, New York and some of the acts of discrimination and retaliation occurred within the Southern District of New York.

12.     Plaintiff filed a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") against Defendants on or about September 10, 2024.  On March 21, 2025, the EEOC issued Plaintiff a notice of right to sue.

<u>PARTIES</u>

13.     Plaintiff is a Hispanic man who worked for Defendants from February 2016 to November 2017 and again from January 2019 until August 2024.  He resides in Goshen, New York, where he worked for Defendants remotely.

14.     On information and belief, Samsung Electronics Co., LTD is a corporation organized under the laws of South Korea.

15.     On information and belief, Samsung Electronics America, Inc. is a corporation organized under the laws of the State of Delaware with offices in New York, New York.

16.     On information and belief, Samsung Electronics America, Inc. is a wholly owned subsidiary of Samsung Electronics Co., LTD.

<u>FACTUAL ALLEGATIONS</u>

<u>Background</u>

A.  <u>Plaintiff's Background and Initial Tenure with Samsung</u>

17.     DeRosa is an accomplished sales leader with decades of experience in telecommunications, including, for approximately nine years, as a Senior Director of Sales at Samsung. He has a bachelor's degree in engineering and a masters in telecommunications.

18.     DeRosa is a Hispanic man.

19.     Samsung hired Plaintiff in or around February 2016 as Senior Director of Sales. In that role, he worked for Ojert, who is white. As a result of the discrimination to which

Ojert subjected Plaintiff during this time (described in more detail below), Plaintiff left Samsung in or around November 2017 for a role with a different company.

20.    Despite the issues he encountered between 2016 and 2017, DeRosa was highly successful during his initial tenure at Samsung. For example, during this 22-month period, DeRosa generated over $150 million in revenue for the Company. Also, after Plaintiff left, multiple Samsung colleagues reached out to him for advice on active sales campaigns and to request that he return to Samsung.

B.    DeRosa's Return to Samsung and Most Recent Role

21.    In or around January 2019, DeRosa's then-employer underwent a restructuring and eliminated his role. Despite the discrimination Plaintiff faced during his first stint at Samsung, DeRosa was out of work and needed income. Samsung re-hired DeRosa as a Senior Director of Sales, once again reporting to Ojert, a Senior Vice President. DeRosa also indirectly reported, through Ojert, to Ojert's boss and Executive Vice President Mark Louison ("Louison").

22.    Plaintiff was continuously employed by Samsung in the Senior Director of Sales role from January 2019 until Samsung unlawfully terminated his employment in or around August 2024.

23.    In his role, Plaintiff was part of Samsung's Networks Division. The senior employees of the Networks Division included DeRosa; Program Management Vice President "JH"; and Sales Operations Senior Director Sean Chi ("Chi"); all of whom reported to Ojert, as well as Vice President Business Development and Strategy Alok Shaw ("Shaw"), who reported to Louison.

24.    Throughout his tenure, DeRosa was employed directly by Samsung Electronics America, Inc. However, his work was subject to oversight and approval by Samsung

Electronics America, Inc.'s global parent company Samsung Electronics Co., LTD. Among other things, Samsung Electronics Co., LTD. had final authority to approve all of the deals DeRosa worked on. As discussed in more detail below, DeRosa also reported indirectly to and worked closely with Woojune Kim ("Kim"), the President of Samsung Networks and, on information and belief, an employee of Samsung Electronics Co., LTD.  Further, at all times during his employment, DeRosa maintained two email addresses, one affiliated with Samsung Electronics America, Inc. and one affiliated with Samsung Electronics Co., LTD.

25.     Louison reported to KS Choi ("Choi"), the President and CEO of Samsung North America.

26.     As Senior Director of Sales, DeRosa was responsible for, among other things, leading all contractual agreements for the Networks Division's Client A Account, determining pricing strategy for all of the Division's products and services, handling strategy for product procurement, and working with other teams throughout the Company to support commercial discussions.

<u>Plaintiff's Success at Samsung</u>

27.     DeRosa performance at Samsung was excellent.

A.  <u>SNAP Deal</u>

28.     Among many accomplishments, Plaintiff acted as account lead on a deal between Samsung and Client A known as the Samsung Network Acceleration Program ("SNAP"), a deal that ultimately generated $6.7 billion in revenue.

29.     Shortly after Plaintiff re-joined Samsung, the Company sought ways to increase its market share. As part of that process, around this time Plaintiff pitched internally a

pricing structure for a potential deal with Client A involving Samsung's Virtual Radio Access Network ("VRAN").

30.     VRAN is a software that enables connection between mobile devices and networks. Unlike standard Radio Access Networks ("RAN") in cell towers, VRAN is decoupled from hardware and can run on any system.

31.     In or around August 2019, DeRosa pitched to Samsung leadership, including Ojert, Louison, and President of Samsung Networks Kim the idea of selling licenses for Samsung's VRAN to Client A as well as replacing the existing RANS (then supplied by a competitor) in Client A cell towers.

32.     Samsung decided to move forward with DeRosa's pitch. In or around August 2019, Plaintiff began serving as the leader of a team of finance employees, technical staff, and legal to structure a deal with Client A.

33.     Plaintiff was the commercial account lead for the SNAP deal from the initial sales pitch until it successfully closed in or around June 2020. He personally brought the proposal to Client A in or around September of 2019. He continued to lead the deal, including serving as the primary person responsible for structuring the deal, until it closed in or around June 2020. Plaintiff was Samsung's main point of contact with Client A for the SNAP deal, including that he was Samsung's sole representative on the discussions with Client A immediately preceding the deal's closure. Throughout this process, Plaintiff worked closely with Kim.

34.     When the deal closed, Louison (the Executive Vice President of the Network's Division and Ojert's boss), sent Plaintiff an email congratulating him for having executed the "deal of the century."

35.    The SNAP deal was a significant win for Samsung. Among other things, it generated $6.7 billion in revenue and strategically gave Samsung a tier one wireless operator in the United States. It was also one of the first such VRAN agreements of its kind. As a result, the SNAP deal received glowing and extensive press coverage.

36.    After the SNAP deal closed, Plaintiff continued to contribute significantly to Samsung's revenue, outpacing all of his peers on both the Networks Division and of the employees working to support Client A.

B.  Additional Successful Initiatives

37.    In addition to the SNAP Deal, Plaintiff played an instrumental role in numerous other projects that generated significant revenue for the Company, including several initiatives that laid the foundation for the SNAP Deal.

38.    For example, in or around December 2016, Plaintiff leveraged his relationship with Client A's Director of Finance to secure $36 million in funding for 5G testing. This investment was crucial for the continued viability of the 5GTF program and marked one of the industry's initial 5G agreements. This was recognized as a significant achievement for both the Networks Division and for Samsung as a whole. Several years later, while visiting Korea, DeRosa was in Network President Kim's office and saw that one of the first purchase orders DeRosa had secured as part of the $36 million agreement was framed and displayed in Kim's office. This was the only purchase order Kim displayed among all others from any operator worldwide.

39.    In or around May 2019, Plaintiff collaborated with Kim to successfully negotiate a $100 million agreement for 5GNR AU (Millimeter Wave Radios) using a ratio purchase incentive strategy. Through this agreement, Samsung was able to increase its market share by acquiring for the first time the New Orleans market. The achievement followed a successful tour

that Plaintiff led of Samsung's manufacturing facilities in Korea for the Client A Supply Chain leadership team.

40.    Plaintiff also, in or around June 2019, devised a last time buy initiative for Client A to purchase 5G Non-Integrated radios by providing an incentive for doing so. That deal secured an additional $3 million in revenue for Samsung and allowed the Company to avoid being stuck with excess inventory on which it would take a substantial loss.

41.    Additionally, in 2019, DeRosa secured the inaugural Proactive Support Installation Help Desk and Commissioning-Integration agreement worth $14 million with Client A, positioning Samsung competitively with its rivals in terms of customer service. His extensive experience selling these services earlier in his career provided him with a distinct advantage in closing this deal.

42.    DeRosa also proposed and initiated the idea of conducting quarterly business reviews with Client A where Samsung would review with Client A's Maintenance Engineering their progress on achieving certain Key Performance Indicators ("KPIs"). Prior to DeRosa's arrival in 2018, there was little to no interaction between Client A Maintenance Engineering and Samsung leadership. The introduction of Quarterly Business Reviews with Client A was instrumental in obtaining the $6.7B SNAP Agreement. For example, on information and belief, Client A's Maintenance Engineering team, specifically Client A's senior executive, gave their approval before Client A agreed to the SNAP Deal.

43.    In addition, in or around July 2020, Plaintiff successfully negotiated and secured a third-party agreement with Client B. This agreement included the sale of a $4 million

multi-year testing and support services package to Client A. This deal would be later used in the future as a template to win a $10 million multi-year deal for Client C.

44.    Also, in or around 2022, Plaintiff helped the Network Division secure more than $100 million for the procurement of additional hardware (CDU-30 and LCC cards). This deal played a crucial role in surpassing the revenue targets set for the division.

45.    In July 2022, Plaintiff identified Client A's preference for advanced Open Radio Access Network ("ORAN") technology, which included filters to protect against interference. Plaintiff adjusted the pricing strategy by initially increasing the price of the ORAN radio and subsequently offering a credit for FOC, thereby bridging a $1,000 pricing gap and resolving an issue for both parties. This strategy led to securing an agreement and resulted in tens of millions of dollars in unanticipated revenue.

46.    Further, in or around July 2023, DeRosa persuaded Client A (after more than two years) to invest $8 million in containerization software development. This opportunity was especially important to Kim because it was a very high margin opportunity due to its sunk development cost. Kim asked for regular updates during monthly headquarters meetings on the status to underscore its importance.  DeRosa conducted extensive research and crafted arguments to demonstrate the advantages of a paid development solution. DeRosa emphasized the optional nature of the development process and highlighted the long-term benefits that would surpass the initial investment. DeRosa's efforts culminated in successfully securing the deal in or around December 2023.

47.    In September 2023, DeRosa secured an agreement for the MMU-2 C-Band Radios, guaranteeing a gain of close to $300 million in revenue for Samsung, along with a 10% price increase for the MMU product line. The agreement included a stipulation in the agreement

to secure a close to $150 million VRAN software payment purchase order in 2024, with consideration for invoicing before year-end 2023.

48.    DeRosa also went out of his way to foster and maintain strong relationships with Samsung's customers and partners. For example, in or around May 2019, Client A leadership raised an issue with Samsung's presentation of certain KPIs. Even though outside of DeRosa's responsibilities, he volunteered to resolve the issue and subsequently worked tirelessly with Samsung's Research and Development ("R&D") team to ensure they understood the importance of aligning the KPIs to Client A's expectations. The Client A leaders with whom Samsung worked with acknowledged that most Sales Directors would not have gone out of their way to take this task on and thanked DeRosa for his contributions.

49.    Similarly, in or around May 2020, Plaintiff worked to address a longstanding issue from Client A about its discrete network cables – an issue initially assigned to Samsung engineers. When Client A threatened to halt Samsung site deployments in the Northeast, Plaintiff intervened. He collaborated with the R&D team to certify hybrid cables and persuaded Client A to issue a Request for Proposal for all cable suppliers to reduce costs. As a result, the Company's supplier agreed that Samsung could resell their cables, generating over millions in revenue and reducing costs for Samsung. This solution enabled Client A to meet their customer's requirements and resume site deployments without disruption.

50.    In addition, Plaintiff worked to address critical supply chain issues. During the Global Supply Chain Crisis of 2021, Samsung faced critical inventory shortages and was failing to meet the necessary 60-day stock levels. This issue was escalated to Client A's Business CEO. To address the problem, Plaintiff led the development of a heatmap in collaboration with HQ Sales and SEA Supply Chain, which visualized Samsung's inventory status. Samsung

continues to use the heatmap for ongoing monitoring. Plaintiff also personally crafted and presented the Company's "get well" plan to Client A's senior executives. The plan outlined Samsung's corrective steps to address the inventory shortfall and mitigate the crisis's impact. Through these initiatives, DeRosa played a key role in addressing the inventory challenge and ensured more stable operations. This was essential to avoid the client going back to its previous supplier and potentially canceling the agreement or causing Samsung to pay millions in performance compensation penalties.

51.     DeRosa also went out of his way to assist his colleagues. For example, in or around 2021, Client A purchased over $6 million in minor materials for site installations but later left Samsung with over $4 million in excess inventory. Maintaining the excess inventory would have resulted in Vice President of Network Services Lyle Nyffeler ("Nyffeler") and his team being held responsible for a significant loss and jeopardized the team's ability to receive performance-based bonuses. DeRosa stepped in to help resolve the issue. DeRosa ultimately successfully proposed two solutions: selling the materials to Client A's suppliers or using them at a competitor's sites. Both approaches significantly reduced the inventory, earning commendations from the finance and deployment teams. Nyffeler told DeRosa, in sum and substance, "it shows a lot about [DeRosa] that [DeRosa] wanted [his] teammates to achieve their bonus."

C.  Positive Feedback

52.     Consistent with his outsized contributions to Samsung, DeRosa's performance reviews in his role were overwhelmingly positive.

53.     During each year DeRosa worked for Samsung, he received an overall performance rating of at least "meets expectations." In many years, he received an overall rating of "exceeds expectations."

54.    DeRosa also received positive feedback from management and from his peers about his work.

55.    Samsung also awarded DeRosa significant bonuses throughout his employment, including performance-based retention bonuses that Samsung only gave to its key employees.

<u>Failure To Promote</u>

56.    Despite his success, Samsung consistently overlooked Plaintiff for promotions while providing such opportunities to his non-Hispanic peers.

57.    After the SNAP deal closed, many of Plaintiff's non-Hispanic managers and team members received promotions in recognition of the success of the deal.

58.    For example, Samsung promoted Kim, who is Asian, from Executive Vice President to President. On information and belief, Kim's promotion was a direct result of the SNAP deal.

59.    Louison, who is white and Asian, was promoted to Executive Vice President.  Louison also promoted Ojert, who is also white, from Vice President to Senior Vice President.

60.    Ojert also promoted several of Plaintiff's peers, including JH, who is Asian, and Chi, who is Asian. Samsung promoted both JH and Chi in or around 2022.

61.    Even though Plaintiff had spearheaded the SNAP deal and was instrumental in its success, Samsung did not consider him for a promotion. On information and belief, Ojert made the decision not to promote Plaintiff.

62.    Nor did Ojert consider DeRosa for a promotion thereafter. Indeed, in or around 2023, DeRosa approached Ojert about a potential promotion. Despite DeRosa's success in

his role, Ojert refused to engage with him about growth opportunities, instead stating that he was "disappointed" in DeRosa that he had asked. On information and belief, Ojert also complained to Louison about DeRosa's request.  JH, DeRosa's colleague, later told him that Louison and Ojert had been upset with DeRosa for asking about the promotion but tried to reassure him, stating, "they will get over it."

63.     The following week, DeRosa was pulled into a meeting with Ojert, Louison, and DeRosa's colleagues for a strategy meeting to discuss supplier market share. Louison admonished DeRosa during the meeting and stated, in sum and substance, "I do not care what you have sold if you cannot answer a question on market share you are not a Vice President." On information and belief, Louison made these comments to make clear to DeRosa that he should stop requesting career advancement and to accept his place. DeRosa left the meeting humiliated and dejected.

64.     Ojert also expressed to Plaintiff on multiple occasions that (despite Plaintiff's accomplishments), he would not be fit for a promotion nor would make any effort to help him advance his career, as he had done with many of Plaintiff's non-Hispanic and non-disabled peers. Ojert stated on multiple occasions that he believed that leaders are "born" not "made" and "either you have it or you don't." On information and belief, Ojert meant that Plaintiff's inherent traits (including his race, actual disability, and perceived disability) made Plaintiff, in his mind, ineligible for leadership and that those in positions of power were inherently superior.

65.     On information and belief, Ojert prevented DeRosa from being promoted even though Samsung leadership had advocated for DeRosa's advancement. For example, in or

around early 2022 Kim advocated for DeRosa to be promoted in recognition of his excellent performance.

66.     Despite this support from leadership and as a result of Ojert's discriminatory treatment, Plaintiff's title, Senior Director of Sales, remained the same throughout his employment at Samsung.

<u>Discriminatory Harassment</u>

A.  <u>Race Discrimination</u>

67.     Ojert's motivations in ignoring DeRosa's contributions and passing him over for promotion were no mystery.  Throughout DeRosa's employment, Ojert consistently made demeaning comments about DeRosa's body and weight and treated him and his Hispanic peers markedly differently than DeRosa's non-Hispanic and non-disabled teammates.

68.     Ojert repeatedly yelled at and used abusive language towards Plaintiff and his Hispanic colleagues. For example, in or around November 2016, Ojert became frustrated during a staff meeting which included many of Plaintiff's peers. During that meeting, Ojert yelled at DeRosa and his colleague, who is also Hispanic, "I don't fucking need you or you" while pointing at DeRosa and his Hispanic colleague.

69.     Similarly, in or around August 2017, DeRosa and his Hispanic colleague were both working remotely (with approval). Ojert yelled at them during a meeting that if they were not going to be in the office, "I don't fucking need you." At the time, several other colleagues who were not Hispanic were working remotely; Ojert did not subject these colleagues to similar abuse.

70.     Ojert also repeatedly threatened to fire DeRosa during one-on-one meetings and discussions DeRosa attended with him. For example, in June 2017, Ojert stated "I will fucking

fire you" to DeRosa during a phone call. This conduct continued throughout DeRosa's second stint at Samsung, including into 2023.

71.    DeRosa never observed Ojert yell or curse at DeRosa's non-Hispanic peers in this manner. Nor did he threaten to fire them.

72.    In or around Summer 2024 (shortly before Samsung unlawfully terminated DeRosa's employment), Samsung fired DeRosa's Hispanic colleague.

B.    Disability Discrimination

73.    DeRosa has been diagnosed with morbid obesity. At all times relevant to this Complaint, his BMI was 43. Over 30 is obese.[1] Over 40 suggests morbid obesity.[2]

74.    DeRosa's disability of morbid obesity significantly limited his major life activities. Among other things, DeRosa experienced multiple related conditions, including that he was diagnosed as pre-diabetic, which ultimately required him to take medication to control his blood sugars, and dealt with high cholesterol.

75.    Ojert made comments about DeRosa's body – including his weight – to DeRosa and in front of DeRosa's colleagues.

76.    For example, on multiple occasions in front of DeRosa's colleagues Ojert suggested that DeRosa should use "chemo" as a diet to lose weight "like [Client A's former Chief Networks Officer]." Ojert's comments were humiliating and hurtful, particularly because, as Ojert was aware, DeRosa lost his mother to cancer and the side effects of chemotherapy treatment.

---

[1] *Calculate Your Body Mass Index*, NIH NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

[2] *BMI Calculator*, PENN MEDICINE PRINCETON HEALTH, https://www.princetonhcs.org/care-services/institute-for-surgical-care/the-center-for-bariatric-surgery-and-metabolic-medicine/resources/bmi-calculator.

77.     Client A's former Chief Networks Officer is a breast cancer survivor is someone DeRosa considers a friend. Ojert's comments suggested that Client A's former Chief Networks Officer, like DeRosa, was obese and denigrated both of them for their body sizes.

78.     Also, in or around July 2023, DeRosa sent Ojert and Chi a picture of a bruise on DeRosa's hamstring to ask their opinion, as both have experience with athletics and injuries. Ojert responded to DeRosa, "that leads up to a big ass." These comments about DeRosa's weight and his body – particularly coming from his manager – made him uncomfortable, and make it clear Ojert regarded DeRosa as being disabled.

C.  Sexual Harassment

79.     In addition, Ojert made sexual and demeaning comments that undermined Plaintiff's competence at his job. For example, Ojert has referred to DeRosa as a "failed male prostitute" in front of DeRosa's colleagues when discussing DeRosa's purported shortcomings in sales.

80.     Ojert has also stated on several occasions, including in June 2020, September 2020, and September 2022, that Plaintiff "had to do sexual favors," or words to that effect, in order to close deals. Ojert made these comments in front of senior leadership at Samsung. For example, then-President Paul Chueng was present for Ojert's comments to that effect in or around June 2020. Kim was present for Ojert's September 2022 comment.

81.     Plaintiff was not the only target of Ojert's sexualized and demeaning remarks. For example, Ojert repeatedly targeted JH with inappropriate sexual attention. Among other things, DeRosa has seen Ojert locked in an intimate embrace with JH during a break from a Network Division meeting, and, according to JH, he has also kissed JH on the forehead on at least one occasion. JH told DeRosa that, according to Ojert, the kiss was not inappropriate because it

was, in sum and substance "like he kisses the girls on his daughter's soccer team when they are upset."

82.     Also, on multiple occasions, Ojert referred (in front of multiple colleagues) to the shoes JH was wearing as "hooker shoes" and, on another occasion, told JH, "you should be dancing on a pole with those shoes."

83.     Louison (who had been, for a time, the first Chief Diversity Equity and Inclusion officer for Samsung SEA), was often present for Ojert's discriminatory and harassing remarks, but did nothing to stop Ojert from engaging in this unlawful conduct.

<u>Retaliation</u>

84.     Plaintiff complained repeatedly about Ojert's unlawful treatment in the months leading up to DeRosa's unlawful firing. Not only did Samsung do nothing to remedy the unlawful discrimination, Samsung, and in particular Ojert's, hostility towards Plaintiff only escalated following Plaintiff's complaints.

<u>DeRosa's Initial Complaints</u>

85.     On or about November 27, 2023, Ojert sent an email to the senior leadership of the Networks Division (of which DeRosa was a part) to solicit our feedback about several promotions that had been planned and/or considered within the Networks Division.

86.     In response, on or about November 29, 2023, Plaintiff wrote to the group objecting to the number of promotions, which, Plaintiff stated, resulted in an "imbalance" in job titles. Among other things, Plaintiff wrote that the division had been promoting employees without "significant achievement" while overlooking those who had generated significant revenue.

87.    On information and belief, Ojert understood that DeRosa's objection to the promotions, was based in part on the fact that DeRosa had been consistently overlooked for promotions while his non-Hispanic peers had been rewarded for DeRosa's efforts.

88.    Ojert's retaliation was immediate and harsh. In response to an email discussion about DeRosa's feedback between a colleague and DeRosa, Ojert sent an email directed at DeRosa that stated "STOP" (capitalization in the original).

89.    Wanting to escape Ojert's hostility and hoping to defuse the situation, Plaintiff asked Ojert if Plaintiff could take vacation time for the following two days. In response, Ojert insisted that Plaintiff take seven full vacation days. Plaintiff asked Ojert why he should take so much time off. Ojert refused to answer. Accordingly, feeling that he had no choice, Plaintiff took the following seven business days off. Plaintiff perceived this to be an unjustified suspension.

90.    On December 10, 2023 (a Sunday), Ojert sent DeRosa a calendar invitation asking to meet with him immediately upon DeRosa's return on Monday December 11, 2023. During the meeting, Ojert chastised Plaintiff for having raised concerns about his promotional decisions. Ojert, among other things, told DeRosa that the email had been unprofessional and that he was going to document the issue with Human Resources ("HR"). That same day, Ojert carried through with his threat by sending an email to HR in which he called DeRosa's comments "immature," and raised a purported and previously undocumented issue he had with DeRosa's conduct during a discussion DeRosa had with him years earlier, in 2017.

91.    That same day, DeRosa wrote to HR officer Nick DiPonzio ("DiPonzio") to complain about Ojert's discrimination and retaliation against DeRosa. In particular, Plaintiff's complaint discussed (as described in the examples above), Ojert's sexual harassment, race discrimination, and disability discrimination.

19

92.    On or about December 12, 2023, DiPonzio contacted Plaintiff to inform him that Samsung was purportedly investigating his complaints. However, Plaintiff did not hear from DiPonzio for the remainder of the year.

93.    On or about January 8, 2024, having still not heard from Samsung HR and after facing increasing retaliation from Ojert (as described below), Plaintiff forwarded his December 11, 2023 complaint to Samsung CEO and President Choi, copying DePonzio.  At this point, on information and belief, Samsung finally assigned its internal investigator to investigate Plaintiff's discrimination and retaliation claims.

<u>Retaliation for Plaintiff's Initial Complaints</u>

A.  <u>Ojert Refuses to Speak with Plaintiff, Excludes Him from Meetings</u>

94.    Following DeRosa's December 11, 2023 complaint to HR, Ojert made consistent efforts to punish him for his protected complaints. For example, between December 11, 2023 and January 30, 2024, Ojert never met with Plaintiff one-on-one, even though Plaintiff met with Ojert regularly prior to Plaintiff's protected complaints.

95.    Ojert also excluded Plaintiff from meetings with Client A related to the SNAP deal. In or around January and early February 2024, on information and belief, Ojert met with Client A's point person two or three times about a potential extension of the deal. DeRosa had previously worked with Client A's employee on multiple occasions related to the SNAP deal and had an excellent working relationship with him. Nevertheless, Ojert failed to invite DeRosa to participate in these meetings even though the client requested DeRosa's inclusion.

96.    Ojert similarly excluded Plaintiff from at least one internal team meeting about the SNAP deal. DeRosa later learned from a coworker that the team had met without him.

97.     Ojert excluded Plaintiff from these calls and meetings even though Plaintiff had successfully led negotiations for the initial deal and ordinarily would have been included in both the internal calls and the calls with Verizon. On information and belief, Ojert had no non-retaliatory justification for excluding DeRosa from these calls and meetings.

98.     When Plaintiff was invited to attend meetings, Plaintiff's contributions and questions went ignored. For example, on or about January 24, 2024, DeRosa attended an all-team meeting. Prior to the meeting (as requested of the attendees), Plaintiff submitted a detailed question about a prior proposal he had crafted to Louison and other leadership. DeRosa submitted the same question via a WebEx chat during the meeting itself to ensure that Louison would see it. No one answered or addressed DeRosa's question during the meeting.

99.     Ojert also, on information and belief, instructed DeRosa's teammates to minimize DeRosa's contributions after DeRosa raised the December 11, 2023 complaint. For example, in or around January 2024, DeRosa's team put together a weekly report for Kim regarding their work. Chi was responsible for generating the report. In or around January 2024, DeRosa sent to Chi for inclusion in the executive summary a proposal DeRosa had made to Client A for a future deal about which Client A had expressed strong interest. Chi, without explanation, refused to include the proposed deal in the executive summary and copied DeRosa's peer JH on his responses to DeRosa. Prior to Plaintiff's protected complaints, Plaintiff often highlighted his ideas and proposals in the weekly report.

B.     Ojert Makes it More Difficult for Plaintiff to Utilize Reasonable Accommodations

100.    Throughout Plaintiff's time at Samsung, he had worked predominantly from his home in New York, traveling into the office only occasionally for meetings and conferences.

Samsung was aware of and approved Plaintiff working from home. Indeed, Samsung classified Plaintiff as a "home office employee."

101.    After DeRosa's protected complaint, Ojert made it more difficult for DeRosa to work from home even though DeRosa had a medical reason to continue doing so.

102.    In or around early August 2023, DeRosa had surgery to repair a ruptured hamstring. Although DeRosa was able to continue working from home following the surgery (with limited interruptions to undergo the surgery itself), his doctor recommended that he not travel to the office for any in-person meetings for at least six to eight weeks while he recovered.

103.    DeRosa informed Ojert of his need for accommodation on or about August 2, 2023. Ojert approved DeRosa's request to continue to work from home and to be excused from attending meetings in person without question. Ojert did not forward Plaintiff's request to work from home to any HR employees or otherwise involve HR in Plaintiff's request.

104.    In or around January 2024, Plaintiff's doctor again advised him to avoid traveling to the office for in-person meetings. Accordingly, as Plaintiff had in August 2023, he reiterated his request to Ojert that he be excused from attending meetings in person.

105.    Ojert's reaction to Plaintiff's request was markedly different from the way he handled Plaintiff's identical request in August 2023. Ojert did not respond to Plaintiff's request to continue working exclusively from home. Instead, Ojert had apparently forwarded the request to HR. Accordingly (even though Plaintiff had worked almost exclusively from home for years), HR reached out to Plaintiff and asked him to formally request remote work as a reasonable accommodation and to provide a doctor's note. Prior to Plaintiff's protected complaints, Ojert has never shared Plaintiff's requests with HR nor required him to go through Samsung's process for requesting a reasonable accommodation.

22

<u>Plaintiff Raises Additional Concerns and Begins a Leave of Absence</u>

106.    In light of Ojert's increasing retaliation against DeRosa, on or about January 28, 2024 DeRosa reached out to Samsung's investigator to raise additional complaints. DeRosa sent the investigator a complaint detailing, <u>inter alia</u>, his exclusion from discussions regarding the SNAP deal and Ojert's imposing additional processes on him to continue to work from home. DeRosa wrote in the complaint that he believed from Ojert's behavior that he "intend[ed] to terminate [DeRosa]" and that having finally understood the "extent of the mistreatment," DeRosa was forced to "bring up issues of a hostile, abusive environment, and discriminatory behavior."

107.    In January 2024, Chang Choi, Senior Director of Network HQ, reached out to DeRosa because Kim was concerned that the issue with Ojert was not being resolved. Chang Choi told DeRosa, "[DeRosa] you are too important to the business to lose". Chang Choi also told DeRosa that he wanted him to have a "soft landing" because he believed Magnus intended to fire DeRosa. When Chang Choi approached Ojert to discuss the issue with him, Ojert apparently told Chang Choi he would accept DeRosa back, but "[DeRosa] had to stop requesting to be a Vice President."

108.    On or about January 30, 2024, Ojert summoned DeRosa to a one-on-one meeting for the first time since December 11, 2024. During that meeting, Ojert spoke to DeRosa in a harsh and defensive tone about his decision to exclude DeRosa from calls related to the SNAP deal which DeRosa had raised in his complaint two days prior.

109.    On or about February 6, 2024, Plaintiff requested and received a leave of absence so that he could avoid Ojert's retaliatory conduct, which had become intolerable.

<u>Continued Retaliation and Additional Complaints</u>

110.    Ojert managed to continue to retaliate against Plaintiff even when he was on leave.

111.    Throughout February 2024, Plaintiff met multiple times with Samsung's investigator and detailed Ojert's discrimination and retaliation against him. On February 22, 2024, Plaintiff informed Samsung's investigator that he had retained counsel in connection with his complaints.

112.    On or about March 1, 2024, Ojert gave DeRosa his performance review for 2023. Even though the overall rating Plaintiff received, "meets expectations," was a positive one, the performance review was riddled with errors and minimized Plaintiff's accomplishments and contributions to the Company in the previous year.

113.    As an example, in 2022, Plaintiff received an exceeded rating due to closing a $100M agreement, however in 2023, Plaintiff received a "meets" rating even though he secured a deal three times the size of the 2022, $100M agreement.

114.    Specifically, in 2023, DeRosa secured an agreement for the MMU-2 C-Band Radios, guaranteeing a gain of close to $300M in revenue for Samsung, along with a 10% price increase for the MMU product line. Such a price raise with Client A was rare, if not unprecedented.

115.    Ojert also attempted to demean DeRosa as a leader by falsely accusing DeRosa of not coaching or developing employees who reported to DeRosa.

116.    On information and belief, Ojert submitted his rating in or around December 2023 or January 2024, shortly after Plaintiff raised complaints about Ojert's discrimination and retaliation against Plaintiff.

117.    Plaintiff submitted a detailed rebuttal (which included among other things documented proof of coaching and developing employees) to the review several days later, on or about March 4, 2024. In the rebuttal Plaintiff stated, among other things, that he believed the review was retaliatory.

Samsung's Investigation

118.    As described above, in early 2024 Plaintiff met multiple times with Samsung's internal investigator Cynthia Speer ("Speer"). DeRosa provided Speer with detailed information concerning Samsung's discrimination and retaliation against him. Among other things, DeRosa described in detail Ojert's discriminatory comments and sent Speer copies of text messages Ojert sent DeRosa containing his biased remarks.

119.    On information and belief, Samsung never intended to investigate DeRosa's complaints in good faith. For example, in or around early 2024 (during one of DeRosa's first meetings with Speer), Speer told DeRosa, in sum and substance, that DeRosa would not be happy with the outcome of the investigation.

120.    Even though Speer had apparently made up her mind about Plaintiff's complaints from the beginning, it took Samsung more than six months to investigate his complaints.

121.    In or around May 2024, Samsung informed Plaintiff (via counsel) that it had concluded its investigation. On information and belief, Samsung has taken no serious corrective action against Ojert for his discrimination and retaliation against Plaintiff. Ojert continues to work for Samsung.

<u>Unlawful Firing</u>

122.    On or about July 26, 2024—approximately two months after Samsung concluded its investigation and while Plaintiff was still on leave—Samsung fired him.

123.    Samsung explained that it was laying Plaintiff off as part of a purported restructuring. On information and belief, Samsung's purported justification was pretextual.

124.    First, even though it is accurate that Samsung laid off others in the Networks Division, a vast majority (approximately 80%) of the Division were not laid off. A majority of the employees who were laid off were engineering employees and not revenue-generating sales employees.  In 2023, DeRosa was the leading salesperson for securing close to $1 billion in revenue, by far exceeding any other Sales director on the account or division.

125.    Second, on information and belief, all employees in leadership positions in DeRosa's team (as he had been) retained their jobs.

126.    Third, on information and belief, DeRosa's role has not been eliminated. To the contrary, on information and belief, Samsung has replaced DeRosa with Shaw, a Vice President Network Strategy whose primary responsibilities involved business development with Client D.

127.    Shaw is an employee who, on information and belief, has limited to no direct sales experience, significant contract wins, or sales accomplishments. At the time Shaw assumed DeRosa's responsibilities, he also had no relationship with or experience in selling directly to Client A. As described in more detail above, Plaintiff had billions of dollars of sales with Client A and numerous customer relationships with Client A that Plaintiff had developed over his career.

128.    Shaw is not Hispanic. Plaintiff is aware of no justification for Samsung to eliminate his position while retaining (and replacing Plaintiff with) an employee with less sales experience and sales-related accomplishments.

129.    Samsung, on information and belief, shoehorned Plaintiff into the restructuring because of its continued discrimination and retaliation against him.

FIRST CAUSE OF ACTION
Section 1981: Race Discrimination

130.    Plaintiff repeats and realleges paragraphs 1 through 129 of this Complaint as if fully set forth herein.

131.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of his race, in violation of Section 1981.

132.    Defendants have acted with malice and/or reckless indifference to plaintiff's statutorily protected rights under Section 1981.

133.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

SECOND CAUSE OF ACTION
Title VII: Sex and Race Discrimination

134.    Plaintiff repeats and realleges paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his sex and race, and subjected him to a hostile work environment on the basis of his sex, in violation of Title VII.

136.    Defendants have acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII.

137.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

THIRD CAUSE OF ACTION
ADA: Disability Discrimination

138.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137 of this Complaint as if set forth fully herein.

139.    Plaintiff has had, at all relevant times, a "disability" as that term is defined in the ADA. Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA.

140.    By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of his actual disability and/or because it regarded him as disabled in violation of the ADA.

141.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

142.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of discriminatory practices by Defendants.

FOURTH CAUSE OF ACTION
State Law: Sex, Race, and Disability Discrimination

143.    Plaintiff repeats and realleges paragraphs 1 through 142 as if fully set forth herein.

144.    By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his sex, race, actual disability and/or being regarded as disabled, and subjected him to a hostile work environment on the basis of his sex, in violation of the State Law.

145.    Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights under the State Law.

146.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

FIFTH CAUSE OF ACTION
Section 1981: Retaliation

147.    Plaintiff repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

148.    By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination under Section 1981 in violation of Section 1981.

149.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Section 1981.

150.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION
### Title VII: Retaliation

151.    Plaintiff repeats and realleges paragraphs 1 through 150 as if fully set forth herein.

152.    By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination under Title VII in violation of Title VII.

153.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights under Title VII

154.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION
### ADA: Retaliation

155.    Plaintiff repeats and realleges paragraphs 1 through 154 as if fully set forth herein.

156.    By the acts and practices described above, Defendants retaliated against Plaintiff for his requesting a reasonable accommodation and for opposing Defendants' unlawful conduct, in violation of the ADA.

157.    Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

158.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of the retaliatory acts by Defendants.

EIGHTH CAUSE OF ACTION
State Law: Retaliation

159.     Plaintiff repeats and realleges paragraphs 1 through 158 as if fully set forth herein.

160.     By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination in violation of the State Law.

161.     Defendants have acted intentionally and with malice or reckless indifference to Plaintiff's statutorily protected rights under the State Law.

162.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.     declaring that the acts and practices complained of herein are in violation of Section 1981, the Title VII, the ADA, and the State Law;

b.     enjoining and permanently restraining these violations;

c.     directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

d.     directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory and retaliatory conduct and making him whole for all earnings and other benefits he would have received but for Defendants' discriminatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.    directing Defendants to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

f.    directing Defendants to pay Plaintiff punitive damages;

g.    awarding Plaintiff his reasonable attorneys' fees and costs;

h.    awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

i.    granting such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
        June 17, 2025

                                        VLADECK, RASKIN & CLARK, P.C.


                                By:    _____*/s/ Emily Bass*_____
                                        Emily Bass
                                        Brandon R. White
                                        Attorneys for Plaintiff
                                        111 Broadway Suite 1505
                                        New York, New York 10006
                                        (212) 403-7300